# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 27, 2005 Session[1]

## JENNIFER LYNN ALSIP, ET AL. v. JOHNSON CITY MEDICAL CENTER, ET AL.

**Interlocutory Appeal from the Law Court for Johnson City**
**No. 21306    Thomas J. Seeley, Jr., Judge**

_____

**Filed June 30, 2005**
_____

**No. E2004-00831-COA-R9-CV**
_____

In this medical malpractice case involving the alleged wrongful death of Walter Ray Alsip ("Mr. Alsip" or "the deceased"), we granted the plaintiffs' Tenn. R. App. P. 9 application for an interlocutory appeal in order to review the trial court's order allowing defense counsel to engage in ex parte dialogue with Mr. Alsip's last-illness, non-defendant treating physicians. We conclude that the trial court erred in entering the order that permitted defense counsel to have private conversations with the non-defendant physicians who treated the deceased during his last illness. Accordingly, we reverse the trial court's order.

**Tenn. R. App. P. 9 Appeal by Permission; Judgment of the Law Court Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

Gary E. Brewer and Leslie A. Muse, Morristown, Tennessee, for the appellants, Jennifer Lynn Alsip, Rebecca Dawn Alsip, and Geraldine Alsip.

Jeffrey M. Ward, Greeneville, Tennessee, for the appellees, Louis Modica, M.D. and Medical Education Assistance Corporation dba ETSU Physicians and Associates.

Randall J. Phillips, Jackson, Tennessee, for Amicus Curiae, Tennessee Trial Lawyers Association.

David L. Steed and Jay N. Chamness, Nashville, Tennessee, for Amicus Curiae, Tennessee Medical Association.

_____

[1]The court heard oral argument in this case at the University of Tennessee College of Law before an audience of law students.

**OPINION**

I.

The plaintiffs[2] sued Louis Modica, M.D. ("the defendant doctor") and others[3] for medical malpractice allegedly associated with the death of the deceased. The alleged operative facts underpinning the malpractice claims of the plaintiffs are set forth in paragraphs nine through eleven of the complaint:

> On approximately August 27, 2000, [the deceased] presented to the Emergency Room at Johnson City Medical Center[4] with a four day history of progressive sore throat, ear ache, fever, and chills. [The deceased] was examined and treated by Dr. Mark J. Wilkinson,[5] who released the patient to return home.
>
> [The deceased] returned to the Emergency Department of Johnson City Medical Center with worsening symptoms on August 28, 2000, where he was again examined and treated by Dr. Wilkinson. Subsequent CT scan revealed a right peritonsillar abscess, which resulted in consultation with [the defendant doctor]. Upon information and belief, [the defendant doctor] negligently cut an artery during attempted drainage and/or aspiration of the abscess, resulting in clinically significant blood loss.
>
> As a direct and proximate result of this blood loss and weakened condition, [the deceased's] condition became critical, and continued to worsen. Over the course of his prolonged hospital stay, he developed ARDS (Adult Respiratory Distress Syndrome), renal failure, and pneumonia, among other problems, and required incubation and eventual tracheostomy. He died in the hospital on November 3, 2000.

(Paragraph numbering in original omitted).

---

[2]The plaintiffs are two daughters of the deceased and his mother.

[3]It appears that, including the defendant doctor, the plaintiffs sued two doctors and three medical entities. We say "it appears" because there are other named "defendants"; but they are apparently nothing more than the trade names of two of the medical entities who are the real defendants.

[4]Johnson City Medical Center is the trade name of the defendant Mountain States Health Alliance.

[5]Dr. Wilkinson is one of the other defendants.

With respect to the defendant doctor, the plaintiffs charge the following acts of negligence:

> failing to fully and appropriately evaluate [the deceased] prior to attempted drainage and/or aspiration of the abscess;
>
> cutting, puncturing, or otherwise injuring an artery during attempted drainage and/or aspiration of the abscess;
>
> failing to perform the attempted drainage and/or aspiration with due and reasonable care;
>
> failing to timely diagnose the complication of significant blood loss during attempted drainage and/or aspiration;
>
> failing to control the bleeding in a timely fashion;
>
> failing to obtain the informed consent of the patient before attempting drainage and/or aspiration of the peritonsillar abscess;
>
> failing to follow and/or monitor the patient at all times material herein;
>
> failing to sufficiently and adequately chart or otherwise record the care, treatment and complications involved in his involvement with the patient;
>
> failing to treat [the deceased] with due and reasonable care; and
>
> deviating from and falling below the acceptable standards of professional practice applicable in this and similar communities.

(Paragraph numbering and lettering in original omitted). The complaint alleges that the defendant doctor was "the agent or apparent agent" of the defendant Medical Education Assistance Corporation ("MEAC") dba ETSU Physicians and Associates. The plaintiffs attempt to establish that MEAC is vicariously liable for the negligence of the defendant doctor.

The defendant doctor and MEAC (collectively "the defendants") filed a motion[6] styled "Motion to Allow Access to Treating Physicians." In the motion, they sought an order allowing their counsel

---

[6]The motion was filed December 19, 2003. Some two years earlier, on December 7, 2001, the trial court entered an agreed order directing that five named counsel for the defendants were "granted access to any and all medical records and radiological films" of the deceased.

to meet with and have ex parte conversations with non-party treating physicians who provided care and treatment for [the deceased] prior to his death.

The defendant doctor and MEAC alluded, in their motion, to the trial court's "previous opinion as expressed in <u>Mary Kilian v. Medical Education Assistance Corporation</u>" ("the **Kilian** case"), as authority for their request. (Underlining in original).

In its order granting – with restrictions – the defendants' motion, the court opined that there is a right of privacy and a covenant of confidentiality between a patient and the patient's physician. The court stated that the filing of a lawsuit does not waive the right or the covenant. It further stated that the court, with respect to the defendants' motion, would continue to follow the policy established by it in the **Kilian** case. The court attached its ruling in the **Kilian** case to the order in the instant case, thereby making it a part of the order. Finally, the court decreed in its order that

> [t]he defense motion will be granted to the extent that the requested doctors[7] were in active communication with [the defendant doctor] during [the deceased's] care and treatment in accord with the criteria established and discussed in the <u>Kilian</u> case.

(Underlining in original). The trial court stayed the "application" of its order "until resolution of any appellate process." The order also granted the plaintiffs' motion for an interlocutory appeal pursuant to Tenn. R. App. P. 9.

In order to fully understand the authority granted to the defendants, it is necessary to examine the pertinent parts of the trial court's ruling in the **Kilian** case. As previously noted, that ruling, *in toto*, was attached to, and made a part of, the order now before us. We quote only the pertinent parts of the **Kilian** ruling:

> Defendant's Counsel may have exparte [sic], that is personal conversations, with Plaintiff's treating physicians who are not Defendants in the case and without the express authorization of the Plaintiff only under the following conditions.
>
> One, that the case involves alleged medical malpractice. Two, that the information sought must relate only to the diagnosis and treatment of the condition for which the Plaintiff originally sought treatment and any time relevant treatment for any injury claimed to have arisen from the alleged malpractice, where the Defendant physician was still involved in treatment of the Plaintiff. Three, no Defendant physician shall be present during the contact between Defense Counsel and a

---

[7]The motion identified nine doctors by name.

-4-

treating physician, and lastly, four, the Court in which the action is pending must authorize the contact pursuant to a Motion filed by Defendant with Notice to the Plaintiff. No authorization is required by the Court or Notice to Plaintiff where the information sought is from a Co-Defendant physician.

The Court's rationale is that there is no expectation of privacy where treating physicians are communicating with each other as to Plaintiff's condition and continuing treatment. The Court also recognizes the expense of formal discovery and the fact that such formal discovery is frequently very time consuming. Lastly, the Defendant, so long as the information sought is relevant, should have equal access to the medical information sought, bearing in mind that the object of any lawsuit is the ascertainment of truth.

\* \* \*

[Counsel for Plaintiff]: In all fairness. Would Your Honor consider requiring that the exparte [sic] contact be recorded in some fashion?

THE COURT: No, . . . .

\* \* \*

[Counsel for Defendant]: Does that, does that mean, Your Honor, that every time we want to do it, we, can we do it at one fell swoop or . . . ?

THE COURT: That's fine as long as you tell me what the, who the physicians are that you want to talk to and, and of course, relate to me the fact that they were treating physicians in communication with the Defendant physicians.

\* \* \*

THE COURT: . . . I'm saying that, you know, even after the alleged malpractice, if the person goes to see another physician and that physician is in active communication with the Defendant physician, I think they ought to be able to talk to that physician. If they turn around and go to another doctor and say, you know, this doctor really messed me up. You know, I want you to take care of me and even if that doctor calls the Defendant physician and says I want your records and that's all the communication, I probably would not. You know,

if the subsequent physician is simply trying to correct the alleged malpractice, I probably would not. But if, if that doctor is coordinating the treatment with the treating physician, yes. So it's more than just bare communication, but there's some coordination of treatment.

[Counsel for Plaintiff]: What about the discussion of the defense theories with a non-treating physician? That goes beyond facts. And I'm asking for clarification. That wasn't really addressed, but those would depend on how, exactly how you finally rule.

THE COURT: Well, again, I think they can ask questions. I don't think they would have to say our theory in this case is such and such, but I think they could ask the question and get the fact they want or the opinion they want without saying our theory in the case is you know, Dr. So and So did operate on the right extremity or something like that.

## II.

The plaintiffs' issue, in their words, is whether "[t]he trial court abused [its] discretion in granting the defendant[s'] unsupported motion for ex parte contact with the decedent's subsequent medical providers." This issue presents a question of law. Hence, "we review [it] under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower court[]." *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

## III.

Generally speaking, a trial court has discretion regarding the subject of pre-trial discovery. *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992). Hence, we review such decisions under an abuse of discretion standard. *Id*. (citing *Payne v. Ramsey*, 591 S.W.2d 434, 436 (Tenn. 1979)). "A trial court abuses its discretion whenever it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining'." *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

In the instant case, the trial court based its ruling upon its understanding of the Supreme Court case of *Givens v. Mullikin*, 75 S.W.3d 383 (Tenn. 2002). The trial court found in that case the legal authority to enter the order requested by the defendants. Hence, the critical issue before us, stated more precisely, is simply this: Did the trial court have the authority to grant the defendants' request for their counsel to engage in informal "personal conversations" with the treating physicians of the deceased, obviously outside the presence of counsel for the plaintiffs, and absent the authorization of the deceased's representative?

IV.

A.

The parties to this appeal – the plaintiffs, the defendant doctor and MEAC – all agree on one thing: the threshold question before us pertains to the proper interpretation of the *Givens* case and how that case applies to the facts of the instant case. There is obviously much in *Givens* that has no bearing on the facts now before us. This is certainly true of the issue in *Givens* that the Supreme Court characterized as the "principal issue," *i.e.*, "whether an insurance carrier and an insured may be held vicariously liable for the alleged tortious actions of an attorney hired to defend the insured." 75 S.W.3d at 390. However, there is much in *Givens* that does have a direct, and, we think, precedential impact on the instant case.

In *Givens*, the Supreme Court reviewed the decisions of the trial court and the Court of Appeals addressing a motion to dismiss pursued by the insurer and its insured in a suit filed by an automobile accident victim. The plaintiff's complaint sought to impose vicarious liability upon these two defendants for the alleged tortious conduct of defense attorneys hired by the insurer for the insured in the underlying automobile accident case. *Id*. at 390-91. Having determined that, under certain circumstances, an insurer, and even an insured, can be vicariously liable for the tortious conduct of their attorneys, the Supreme Court turned its attention to the factual allegations in the complaint, first with respect to those dealing with vicarious liability, and later with respect to those pertaining to the underlying substantive liability. *Id*. at 398, 400. It is a portion of the Supreme Court's discussion of the latter allegations that impact the case at bar.

It is important to remember that the Supreme Court in *Givens* was dealing with a motion to dismiss. When it evaluated the various substantive claims, it accepted as true, as it was required to do, the factual allegations of the complaint. *Id*. at 391. As pertinent to the issue before us, we turn now to the allegations of the plaintiff in *Givens* pertaining to her claims regarding breach of an implied covenant of confidentiality. *Id*. at 407.

The first inquiry of the Supreme Court with respect to the subject claims focused on whether Tennessee recognized an implied covenant of confidentiality between a physician and patient. *Id*. The Supreme Court answered this question in the affirmative:

> [W]e now expressly hold that an implied covenant of confidentiality can arise from the original contract of treatment for payment, and we find that the plaintiff's complaint here has adequately alleged the existence of an implied covenant of confidentiality.

*Id*. at 407-8. Before reaching this conclusion, the Supreme Court alluded to the fact that the General Assembly had enacted several statutes "that expressly require a physician and others to keep a patient's medical records and identifying information confidential." *Id*. at 407. The Court

mentioned Tenn. Code Ann. §§ 63-2-101(b)(1) (1997); 68-11-1502 (2001); and 68-11-1503 (2001). The Court then made the following significant comments:

> Through the enactment of these statutes, patients and physicians now clearly expect that the physician will keep the patient's information confidential, and this expectation arises at the time that the patient seeks treatment. As one of the leading cases recognizing implied covenants of confidentiality in this context has acknowledged,
>
>> Any time a doctor undertakes the treatment of a patient, and the consensual relationship of physician and patient is established, two jural obligations (of significance here) are simultaneously assumed by the doctor. Doctor and patient enter into a simple contract, the patient hoping that he will be cured and the doctor optimistically assuming that he will be compensated. As an implied condition of that contract, this Court is of the opinion that the doctor warrants that any confidential information gained through the relationship will not be released without the patient's permission . . . . Consequently, when a doctor breaches his duty of secrecy, he is in violation of part of his obligations under the contract.

*Id*. (quoting *Hammonds v. Aetna Cas. & Sur. Co.*, 243 F. Supp. 793, 801 (N.D. Ohio 1965)).

Reading all of this in context, we are persuaded that *Givens* requires us to find that there was a covenant of confidentiality in the instant case between the deceased and his last-illness, non-defendant treating physicians.[8] The defendants place great significance on the Supreme Court's use of the words *"can* arise" in the High Court's statement that the "covenant of confidentiality can arise from the original contract" between a physician and his or her patient. *Id*. (emphasis added). However, when this statement is read in context, it is clear that such a covenant does arise unless, perhaps, there is some term to the contrary in the understanding between patient and doctor. We believe that this possibility is what prompted the Supreme Court to use the word "can."

After determining that there is a covenant of confidentiality between a physician and patient in Tennessee and that the factual allegations in the complaint before it showed such a covenant, the Supreme Court then examined the two – rather distinct – ways that the plaintiff in *Givens* claimed the covenant had been breached. *Id*. at 408.

---

[8]This covenant of confidentiality survived the death of Mr. Alsip. *See* 45 CFR 164.502(f) (2005). ("A covered entity must comply with the requirements of this subpart with respect to the protected health information of a deceased individual.")

The Court first discussed the response of the plaintiff's physicians to the defendant's subpoenas, and then it discussed the plaintiff's claim of a *breach of the covenant of confidentiality based upon the physician's private conversations with opposing counsel. **Id**.* While the issue of a response to subpoenas is not before us in the instant case, we will address it first because of the striking difference in language employed by the Supreme Court in discussing these two causes of action.

The issue before the Supreme Court pertaining to subpoenas was whether a physician had a duty to keep a patient's medical information confidential in the face of a "technically defective subpoena." **Id**. The Court found no violation of the covenant in a physician's response to such a subpoena. **Id**. In the course of its discussion, the Court said the following:

> [I]t is clear that whatever the terms of this implied covenant of confidentiality may be, a physician cannot withhold such information in the face of a subpoena or other request cloaked with the authority of the court. Undoubtedly, any such contract would be contrary to public policy as expressed in the rules governing pre-trial discovery and in the relevant medical confidentiality statutes.

**Id**.

When the Court turned next to the subject of opposing counsel's private conversations with a plaintiff's physician, the tenor of the Court's comments changed dramatically:

> A much different case is presented, however, with respect to whether the physician breached his implied covenant of confidentiality by informally speaking to members of the Richardson Firm about the plaintiff's medical information. While the understanding of the parties giving rise to the implied covenant of confidentiality permits a physician to disclose information pursuant to subpoena or court order, this understanding does not include permission to divulge this information informally without the patient's consent. . . . [W]e hold that a physician breaches his or her implied covenant of confidentiality by divulging medical information, without the patient's consent, through informal conversations with others. Accordingly, we find that the complaint in this case alleges sufficient facts showing that the physician breached his implied covenant of confidentiality by informally speaking to the Richardson Firm about the plaintiff's condition without her consent.

**Id**. at 408-9 (internal citation and footnotes omitted). In a footnote to this quote, the Supreme Court observed that

> [t]he physician's statutory duty of confidentiality is subject to several limited exceptions, *see* Tenn. Code Ann. §§ 63-2-101(b)(1); 68-11-1503, but no exception permits disclosure of medical information in private conversations without the patient's consent. As such, we are not inclined to find that patients or physicians typically expect that the physician's implied covenant of confidentiality contains an "informal interview" exception.

*Id*. at 409 n.12.

Certain things are clear from ***Givens***: first, there is an implied covenant of confidentiality between a doctor and his or her patient unless, of course, there is a contrary understanding between them; second, with respect to subpoenas, valid or defective, a physician does not breach that covenant when he or she responds to the subpoena; third, a physician does not breach the covenant if he or she responds to a court order *directing the physician to turn over medical records*;[9] fourth, there is no privilege which bars a physician from testifying, or countenances a physician's refusal to testify, in court or by deposition;[10] and, finally, there are *no* exceptions to a physician's statutory duty of confidentiality that "permit[] disclosure of medical information in private conversations without the patient's consent." ***Id***.

The trial court apparently believed, and the defendants certainly do, that the references to "request[s] cloaked with the authority of the court," and the language "pursuant to subpoena or court order," were sufficient authorization for a trial court to sign an order authorizing an opposing attorney to have private conversations with a plaintiff's treating physicians. ***Id.*** at 408, 409. We disagree. In the first place, there is no such *express* grant of authority in ***Givens***. Furthermore, the aforesaid language is intertwined with language such as "does not include permission to divulge this information informally without the patient's consent," and a breach occurs by a physician "divulging medical information, without the patient's consent, through informal conversations with others," and, finally, "no exception permits disclosure of medical information in private conversations without the patient's consent." ***Id***. Given these very clear and specific statements by the High Court, we are loath to find that ***Givens*** *impliedly* authorizes the type of order involved in this case.

The order in the instant case authorizes attorneys to talk privately with the deceased's treating physicians. This is entirely different from *an order in aid of discovery, authorized by the Rules of Civil Procedure, directing a physician to disclose information or directing a physician to turn over medical records*. These are the types of orders alluded to in ***Givens***. Nowhere in ***Givens*** does the Court suggest, intimate, or even remotely mention an order of the type before us in this case.

---

[9] As previously noted, there is an agreed order in this case allowing defense counsel to review Mr. Alsip's medical records.

[10] ***Givens*** teaches that "the common law of Tennessee . . . does not recognize the existence of a testimonial privilege between a physician and patient." 75 S.W.3d at 408 n.10.

The defendants do not call our attention to any statute, rule of procedure, or Tennessee appellate case authorizing a trial court to issue the type of order now before us. Both sides make public policy arguments. Some are compelling, but, generally speaking, it is not for us to make public policy. We are an error-correcting intermediate appellate court. It is for the General Assembly and the Supreme Court to deal with public policy. *See Smith v. Gore*, 728 S.W.2d 738, 746-47 (Tenn. 1987).

The trial court crafted a thoughtful, limited-in-scope order. Following the policy established by it in the earlier **Kilian** litigation, it provided that (1) orders of this type would be allowed only in medical malpractice cases; (2) the order would apply only to treating physicians who were involved with the patient at the time of the alleged malpractice and/or following, and then only when those treating physicians were in active, coordinated care of the patient with the sued physician; (3) defendant physicians could not be present at the discussions; and (4) "the information sought must relate only to the diagnosis and treatment of the condition for which the Plaintiff originally sought treatment" and matters that resulted as a result of the alleged malpractice. However, despite the careful crafting by the trial court, the order, if carried to fruition – as was obviously the intent of those who sought it – would result in a physician breaching his or her covenant of confidentiality with the patient. This would be the end-product of the order assuming it prompted conversation between the opposing attorney and the treating physician.

The trial court's order has the effect – although this is obviously not a consequence intended by the trial court – of countermanding the Supreme Court's clear (and we are now paraphrasing) edict in *Givens* – "physicians, thou shalt not talk informally with another about your patient's medical information lest ye violate your covenant of confidentiality with your patient in so doing."

B.

The defendants argue that the plaintiffs waived any covenant of confidentiality by filing this medical malpractice action. They rely, at least in part, upon the following statement in the Court of Appeals' opinion in the *Givens* case:

> [W]e hold that a plaintiff cannot state a claim for breach of a confidential relationship where the plaintiff has waived his or her rights to confidentiality. Under the facts of this case, we hold that Plaintiff effectively waived her right to maintain the confidentiality of her relationship with her physicians by making her physical condition an issue in the underlying personal injury action.

*Givens v. Mullikin*, No. W1999-01783-COA-R9-CV, 2000 WL 1839128, at *7 (Tenn. Ct. App. W.S., filed November 28, 2000), *rev'd,* 75 S.W.3d 383 (Tenn. 2002). They correctly point out that the Supreme Court did not address this particular holding of the Court of Appeals in the High Court's opinion.

The defendants also rely upon language in the unpublished opinion of the Court of Appeals in the case of **Wright v. Wasudev**, No. 01A01-9404-CV00176, 1994 WL 642785, at \*5 (Tenn. Ct. App. M.S., filed November 16, 1994), in which this court stated that "the institution of a personal injury suit which presents issues requiring the disclosure of medical information effectively waives such physician-patient privilege as the injured party might assert under Tennessee laws or public policy as to evidence relevant to the issues."

We do not believe these cases support the entry of the order now under review. While the Supreme Court in **Givens** did not express any disagreement with our statement in that case, it also did not expressly approve it. With respect to the **Wright** case, we notice that the opinion in that case refers to a waiver of "such physician-patient *privilege*." 1994 WL 642785, at \*5 (emphasis added). As we have previously noted, there is no physician-patient testimonial *privilege* in Tennessee. *See* **Givens**, 75 S.W.3d at 408 n.10. Since **Wright** does not involve the covenant of confidentiality, and since it refers to a *privilege* that does not exist in Tennessee, we hold that it has no precedential value in the case at bar.

Even if Tennessee law provided that the filing of a lawsuit involving medical issues constituted a waiver by the plaintiff of the covenant of confidentiality, we believe that this law would be preempted by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the rules promulgated by the United States Department of Health and Human Services pursuant to HIPAA. Federal law clearly provides that the provisions of HIPAA and its related rules, where more stringent or, stated another way, more confidentiality-friendly, preempt the less stringent edicts of state law; while states can establish *greater* protections than those provided for under HIPAA, they cannot promulgate rules that provide for *less* stringent protections. 45 C.F.R. § 160.203 (2005).[11] As explained in the case of **Law v. Zuckerman**, 307 F.Supp.2d 705, 711 (D. Md. 2004),

> [t]he key component in analyzing HIPAA's "more stringent" requirement is the ability of the patient to withhold permission and to effectively block disclosure. . . . If state law can force disclosure without a court order, or the patient's consent, it is not "more stringent" than the HIPAA regulations.

---

[11]45 C.F.R. § 160.203 provides, in relevant part, as follows:

A standard, requirement, or implementation specification adopted under this subchapter that is contrary to a provision of State law preempts the provision of State law. This general rule applies, except if one or more of the following conditions is met:

(b)The provision of State law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirement, or implementation specification adopted under subpart E of part 164 of this subchapter.

If, as argued by the defendants, the filing of a suit in Tennessee involving the plaintiff's medical condition works a waiver as to the covenant of confidentiality, such a rule would be less stringent than the protections afforded by HIPAA. This is because the effect of such a rule would be, in effect, to abrogate in that case the covenant of confidentiality. Therefore, with the covenant of confidentiality having been abrogated by the filing of suit, a defendant would have an absolute right to the plaintiff's medical information and could demand its production without any involvement of the court. HIPAA, on the other hand, sets forth precise procedures for the disclosure of "protected health information." *See* 45 C.F.R. § 164.512(e) (2005). Accordingly, Tennessee's less stringent provision would be preempted by HIPAA's more stringent provision.

We find additional support for our holding in the history leading up to the final rule promulgated under HIPAA. A proposed rule in an early draft of the HIPAA rules would have permitted disclosure where an individual who is party to a proceeding puts his or her medical condition or history at issue. *See* Standards for Privacy of Individually Identifiable Health Information, 64 Fed. Reg. 59,918, 60,056-57 (Nov. 3, 1999) (to be codified at 45 C.F.R. pts. 160 to 164). This provision was deleted from the final rule.

We agree with the trial court that the filing of this lawsuit did not constitute a waiver of the covenant of confidentiality.

C.

We hold that *Givens* is a complete and total answer to the defendants' request to have ex parte conversations with the deceased's last-illness, non-defendant treating physicians. In recent years, the issue of confidentiality of a patient's medical information has been at the forefront of public policy discussions, both at the state level and the federal level. Statutory enactments at both levels of government have clearly come down on the side of strengthening confidentiality protections. *Givens* is a clear recognition of this trend. While the defendants may be right when they contend that informal discussions were once the order of the day, that day has, for better or for worse, come to an end.

Since the trial court entered an order without legal authority to do so, it abused its discretion. There is much a trial court can do in aid of pre-trial discovery. The Rules of Civil Procedure so provide, but an order of the type now before us is not one of them.

We have reiterated that which is clearly recognized in *Givens*, *i.e.*, that there is no patient-doctor testimonial privilege in Tennessee. This means that parties to litigation involving medical matters will be able to obtain discoverable information; but it will have to come by way of the consent of the patient or pursuant to the discovery tools recognized in the Rules of Civil Procedure.

Since we have found *Givens* to be a complete answer to the issue now before us, we pretermit the parties' public policy arguments and other issues.

V.

The subject order of the trial court is reversed. Costs on appeal are taxed to the appellees Louis Modica, M.D., and Medical Education Assistance Corporation. This case is remanded to the trial court for further proceedings consistent with this opinion.

_____
CHARLES D. SUSANO, JR., JUDGE